**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

UNITED STATES OF AMERICA,

                Plaintiff,

v.                                CRIMINAL ACTION NO. 2:12-cr-00221

MICHAEL L. WHITE,

                Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending are the following pretrial motions, all filed by Defendant: Motion for Early Production of Records [ECF 14], Objection to Motion to Admit Recording and Transcripts of Consensually Recorded Call [ECF 15], Motion to Deny Any Reference to Other Fire or Fires [ECF 16], and Motion to Dismiss [ECF 17].  The Court held a pretrial motions hearing in this case on February 19, 2013.  For reasons stated more fully on the record at that hearing, the Court **SUSTAINS IN PART** and **OVERRULES IN PART** the Objection to Motion to Admit Recording and Transcripts of Consensually Recorded Call [ECF 15], **GRANTS** the Motion to Deny any Reference to Other Fire or Fires [ECF 16], and **DENIES AS MOOT** the Motion to Dismiss [ECF 17].  The Court took the remaining motion—Defendant's Motion for Early Production of Records—under advisement.  That motion has since been the subject of supplemental briefing and an additional hearing, as discussed below.  For the reasons that follow, the Court **GRANTS** the motion [ECF 14].

1

## I.     BACKGROUND

On December 4, 2012, a federal grand jury returned a three-count indictment charging Defendant Michael L. White with conspiracy to commit arson and mail fraud in violation of 18 U.S.C. § 371, aiding and abetting arson in violation of 18 U.S.C. §§ 844(i) and (2), and being an accessory after the fact in violation of 18 U.S.C. § 3.  As set forth in the indictment, Defendant was the owner of a residential building (the "Van Duplex") located on Route 85 near Van, Boone County, West Virginia.  The indictment charges Defendant with conspiring with Kimberly Dawn Kinder and her since-deceased spouse to damage and destroy the Van Duplex by means of fire and an explosive, all in an attempt to collect the proceeds from the insurance policy covering the property.  The Van Duplex was allegedly set ablaze by the Kinders on October 15, 2009 at Defendant's request.

This is the second indictment brought against Defendant arising from the Van Duplex fire.  The first indictment was returned in Criminal Action No. 2:12-cr-00095 on May 9, 2012 and voluntarily dismissed by the Government three months later.  The facts supporting both indictments were supplied primarily by Kimberly Kinder, whose varying recitation of the circumstances giving rise to the fire required the dismissal of the first indictment.  Kinder was separately charged for her role in the alleged conspiracy and has entered a plea of guilty in this Court to conspiracy to commit arson.  She awaits sentencing.  Her cooperation with the Government has provided crucial evidence of Defendant's culpability, and she is expected to testify as the Government's central witness at trial.

The progression of Kinder's criminal proceeding is intertwined with Defendant's, and an overview of the procedural history of both proceedings is necessary to establish the facts giving

rise to Defendant's pending motion.  On November 4, 2011, the Government issued a target letter to Kinder informing her that she had been connected to the Van Duplex fire.  Kinder entered into a plea agreement on March 5, 2012, in which she agreed to plead guilty to a yet-to-be-filed information charging her with conspiracy to commit arson.  Kinder and the Government entered into a stipulation of facts to establish a factual basis for the plea.  These facts were used to support the first indictment returned against Defendant on May 9, 2012.  In setting forth the overt act in furtherance of the conspiracy, the first indictment alleged that Kinder acted alone in igniting the fire at the Van Duplex.  Kinder testified to these facts before the federal grand jury.

On June 19, 2012, Kinder appeared before this Court for the purpose of entering a plea of guilty.  As part of the plea colloquy, Kinder was asked about her drug use and mental health history.  She testified in open court that she had taken Zanaflex, Xanax, Paxil, Lortab, and Trazodone within the twenty-four hours preceding the hearing.  She also openly testified that she had been hospitalized four times within the last decade for depression and thoughts of suicide.  At least one of these hospitalizations was involuntary.  She also testified that she had previously been diagnosed with schizophrenia, manic depression, and bipolar disorder, though she was unable to recollect when she had received these diagnoses.  The Court then questioned Kinder's counsel about his view of her competency to enter a guilty plea.  Her counsel responded that while he was concerned about Kinder's mental health history, he had not sought an independent evaluation of her competency because she seemed oriented during their meetings and reflected an understanding of their discussions.  While the Court noted that Kinder was a somewhat poor historian of her mental health history, it found her competent to enter a plea of guilty.  Counsel

for Defendant was present in the public gallery during the proceeding to hear this entire discussion.

In preparation for Defendant's trial under the first indictment, Kinder supplied information to the Government that contradicted the facts she had provided earlier.  Kinder now confessed that her recently deceased husband was a member of the conspiracy and acted with her in setting the Van Duplex fire.  This new information forced the Government to dismiss the first indictment as based on inaccurate facts.  Kinder then entered into an amended stipulation of facts which implicated her deceased husband in the crime.  A second plea hearing was held on November 14, 2012 for the limited purpose of permitting Kinder to present this amended stipulation as the factual basis for her guilty plea.  Kinder again testified before the grand jury prior to the return of the second indictment in this case.  She presented the amended stipulation of facts and informed the grand jury of her prior perjury.  Her sentencing has been continued on motion of the Government until after Defendant's trial to allow the Court to fully assess the scope of her cooperation after she testifies.

B.      *Motion for Pretrial Production of Records*

Defendant has filed a motion for the pretrial production of Kinder's medical and mental health records from the four healthcare providers that she identified at her initial plea hearing. Specifically, Defendant requests all records "which relate to Kim Kinder's psychiatric history, diagnosis, treatment and drug usage and abuse."  (ECF 14 at 2.)  In support of his motion, Defendant relies on Federal Rule of Criminal Procedure 17(c) and West Virginia Code § 27-3-1(b)(3), which provides for the disclosure of confidential records by court order and upon a finding that the records are sufficiently relevant to a court proceeding to merit their disclosure.

4

Defendant argues that his Sixth Amendment right of confrontation compels the disclosure of the requested records for impeachment purposes. He also raises an implicit due process claim by relying on *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972), as supplemental authority. The Government responded in opposition to Defendant's motion primarily on the basis of psychotherapist-patient privilege. Kinder, by counsel, filed an objection to the issuance of a subpoena in which she adopted the Government's position.[1] She did not, however, explicitly invoke the privilege.

The Court held a pretrial motions hearing on February 19, 2013, during which it expressed its concern that the pretrial production of the requested records was subject to the psychotherapist-patient privilege recognized in *Jaffee v. Redmond*, 518 U.S. 1 (1996). The Court directed further briefing on the issue. It particularly encouraged the parties to address whether and to what extent federal appellate courts had applied *Jaffee* in criminal cases in derogation of the constitutional rights of a criminal accused. Defendant submitted his supplemental brief on February 22, 2013, to which the Government responded on February 27, 2013.

---

[1]    In preparation for her own sentencing, Kinder signed a release permitting disclosure of her records to the United States Probation Office. Defendant reasons that because portions of the records he seeks are already in the possession of the probation department, they are available to the Government and to the Court. Kinder's principle objection to Defendant's motion goes to this assertion. She claims that her limited waiver of confidentiality for the purpose of aiding the preparation of her own presentence investigation report does not permit open disclosure to the Court and, potentially, the public at large. The Court tends to agree. Defendant has cited no authority for the proposition that a government witness's confidential documents are in the possession or control of the Government for *Brady* purposes merely because they have been provided to the probation department in anticipation of sentencing. Further, requiring the probation office to disclose those documents to the Court for purposes of this case would allow Defendant to circumvent the otherwise stringent requirements governing the disclosure of confidential or privileged material.

5

The Court held a second hearing on Defendant's motion on March 5, 2013, at which Kinder also appeared in person and by counsel.  After placing Kinder under oath, the Court inquired whether she desired to invoke the psychotherapist privilege.  She responded in the affirmative.  The Court then heard further argument from the parties.  Defendant advocated for *in camera* review of the requested documents in spite of Kinder's assertion of the privilege, arguing that the psychotherapist-patient privilege does not trump a criminal defendant's constitutional rights.  He further argued that since the privilege applies only to confidential communications, he was entitled to view any non-privileged matter in the files.  The Government responded that while *Jaffee* was decided in the context of a civil proceeding, its privilege has been uniformly applied by the federal courts of appeals in criminal cases.  It acknowledged, however, the sparse authority on Defendant's constitutional argument.  Even if *Jaffee* contemplated an exception to the privilege when necessary to vindicate the constitutional rights of an accused, the Government argued that the Sixth Amendment does not confer a right of pretrial production here.

At the conclusion of the hearing, the Court ordered the production of the requested files directly to the Court for *in camera* review.[2]  (ECF 46.)  Pursuant to West Virginia Code § 27-3-1(b)(3), the Court found that the documents were "sufficiently relevant to the criminal trial of this matter to warrant *in camera* review . . . for a preliminary determination of their admissibility."  (*Id.*)  Two factors influenced the entry of the Court's order.  First, the Court remained unconvinced at the conclusion of the hearing that the requested records were entirely subject to the privilege.  Defendant seeks records, at least in part, from general hospitals rather

---

[2]    Kinder filed a notice of interlocutory appeal of the Court's order on March 8, 2013.  This Court and the Fourth Circuit denied her motion to stay Defendant's trial while the appeal was resolved.  (ECF 51, 56.)  The Fourth Circuit has yet to issue a decision on the merits of the pending appeal.

than mental health treatment providers. He also requests documents relating to Kinder's drug use, which do not bear any apparent relation to psychiatric care or treatment. Kinder also testified at her plea hearing that she has often presented at hospital emergency rooms with mental health related complaints, only to be promptly sent home. This testimony suggests that portions of the requested records, at the very least, do not reveal communications between Kinder and a psychotherapist. Second, the Court's order contemplated only *in camera* review of the documents by the Court, not disclosure to Defendant.[3] The Court expressly declined a ruling on Defendant's motion until after it completed its *in camera* review.

## II. DISCUSSION

### A. *Federal Rule of Criminal Procedure 17(c)*

Federal Rule of Criminal Procedure 17(c) provides that a criminal defendant may subpoena documents needed to adequately prepare his defense prior to trial. To require pretrial production of documents, the requesting party must demonstrate:

> 1) that the documents are evidentiary and relevent [sic]; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may

---

[3] Trial courts commonly order *in camera* review to determine whether materials requested pursuant to a 17(c) subpoena are subject to production. *See In re Martin Marietta Corp.*, 856 F.2d 619, 622 (4th Cir. 1988) (upholding the district court's order compelling production of materials under Rule 17(c) because the district court determined, after *in camera* review, that the *Nixon* requirements were met); *United States v. LaRouche Campaign*, 841 F.2d 1176, 1180 (1st Cir. 1988) (finding that the district court did not abuse its discretion by ordering *in camera* review after a threshold showing of Rule 17(c)'s requirements was met). *In camera* review is also appropriate in evaluating the applicability of an asserted privilege. *See United States v. Zolin*, 491 U.S. 554, 568 (1989) ("[D]isclosure of allegedly privileged materials to the district court for purposes of determining the merits of a claim of privilege does not have the legal effect of terminating the privilege."); *United States v. Cuthbertson*, 651 F.2d 189, 192 (3d Cir. 1981); *United States v. Haworth*, 168 F.R.D. 660, 661 (D.N.M. 1996).

tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general "fishing expedition."

*United States v. Nixon*, 418 U.S. 683, 699-700 (1974) (citing *United States v. Iozia*, 13 F.R.D. 335, 338 (S.D.N.Y. 1952)).  This standard has been summarized as requiring the defendant to clear the three hurdles of relevancy, admissibility, and specificity.  *Id.*; *see United States v. Caro*, 597 F.3d 608, 620 (4th Cir. 2010).  The decision whether to require the production of the requested documents before trial ultimately rests within the sound discretion of the trial court. *See Nixon*, 418 U.S. at 702.

The Court ordered the *in camera* production of Kinder's records by statute rather than by subpoena.  This statute does not afford Defendant an additional right of discovery in his federal criminal prosecution, however.  Because discovery in criminal cases is limited, *see Caro*, 597 F.3d at 620, the production of these records to Defendant is nonetheless governed by the requirements of Rule 17(c).  Apart from the ultimate question of the applicability of the psychotherapist-patient privilege, the Government also contends (albeit less forcefully) that Defendant's request fails to meet *Nixon*'s standard because Kinder's records are not relevant to this proceeding, impeachment evidence cannot be procured through a Rule 17(c) subpoena, and Defendant's request is not sufficiently specific.  The Court addresses these arguments before turning to the issue of privilege.

 *i.*  Relevancy

Mental health records are relevant for impeachment purposes when they bear on the witness's credibility, either at the time of the events about which she testifies or at the time of trial.  *See United States v. Love*, 329 F.3d 981, 984 (8th Cir. 2003) (quoting *United States v. Jimenez*, 256 F.3d 330, 343 (5th Cir. 2001)); *United States v. Soc'y of Indep. Gasoline Marketers*

*of Am.*, 624 F.2d 461, 467-68 (4th Cir. 1979).  "To be relevant, the mental health records must evince an 'impairment' of the witness's 'ability to comprehend, know, and correctly relate the truth.'" *Jimenez*, 256 F.3d at 343 (quoting *United States v. Partin*, 493 F.2d 750, 762 (5th Cir. 1974)).  At the very least, this standard permits impeachment where a witness's mental illness renders her "delusional and hallucinatory[,] with poor judgment and insight".  *Indep. Gasoline Marketers*, 624 F.2d at 469; *see also United States v. Butt*, 955 F.2d 77, 82-83 (1st Cir. 1992) ("[F]ederal courts appear to have found mental instability relevant to credibility only where, during the time-frame of the events testified to, the witness exhibited a pronounced disposition to lie or hallucinate, or suffered from a severe illness, such as schizophrenia, that dramatically impaired her ability to perceive and tell the truth.").  A diagnosis of depression may also meet this test where the mental health records suggest "a potentially serious mental disorder." *United States v. Smith*, 77 F.3d 511, 516 (D.C. Cir. 1996) (reasoning that the varying forms and symptoms of depression include those that could affect a witness's credibility).  Furthermore, evidence of a witness's drug use is admissible to attack her credibility where it evinces an impairment of the witness's capacity to observe or ability to recall at the time of a particular event or at the time of trial.  *See Jarrett v. United States*, 822 F.2d 1438, 1446 (7th Cir. 1987).

Kinder publicly testified at her plea hearing that she has previously been diagnosed with schizophrenia, depression, and bipolar disorder.  As Defendant points out in his motion, these diagnoses are frequently associated with hallucinations, delusions, disordered thinking and behavior, and detachment from reality.  Further, the time period during which Kinder testified she had been hospitalized—within the last ten years—is further evidence that her mental illnesses may have impaired her ability to perceive and accurately recall the events surrounding

the Van Duplex fire.  The Government argues that Defendant has sufficient information based on Kinder's testimony at the hearing to impeach her credibility without resorting to her records themselves.  While this may seem an attractive proposition, it is an unavailing one.  Having never reviewed Kinder's records, the Government can only speculate as to what potentially relevant material they may contain.  Defendant has sufficiently established the relevancy of Kinder's records, and the Court **FINDS** that Defendant has satisfied this requirement.

ii.     *Admissibilty*

As a general rule, "the need for evidence to impeach witnesses is insufficient to require its production in advance of trial."  *Nixon*, 418 U.S. at 701 (citing *United States v. Carter*, 15 F.R.D. 367, 371 (D.D.C. 1954)).  Impeachment materials are usually not procurable under Rule 17(c) because these materials become evidentiary "only if and when the witness testifies at trial[.]"  *United States v. Cuthbertson*, 630 F.2d 139, 144 (3d Cir. 1980); *see LaRouche Campaign*, 841 F.2d at 1180 (Where a Rule 17(c) subpoena seeks impeachment evidence, "the admissibility prong . . . cannot be fully assessed until the corresponding witness testifies at trial.") (citation omitted).  In *Carter*, the district court had reasoned that impeachment material has no evidentiary value prior to trial because "[t]he Government does not necessarily call at the trial all witnesses from whom it has obtained statements, or always decide in advance exactly what witnesses it will present, since this matter is frequently governed by the exigencies of the trial."  15 F.R.D. at 371.

General propositions do not equate to absolute principles, however, and the district court in this context is still endowed with the discretion to rule based on the facts presented in each particular case.  *LaRouche Campaign*, 841 F.2d at 1180 (citation omitted).  "[T]herefore, . . .

10

where it is known with certainty before trial that the witness will be called to testify, the admissibility determination, within the meaning of *Nixon*, can be made before trial, and the [impeachment material] properly may be considered evidentiary." *United States v. King*, 194 F.R.D. 569, 574 (E.D. Va. 2000); *accord LaRouche Campaign*, 841 F.2d at 1180. This conclusion is consistent with *United States v. Iozia*, the case upon which *Nixon* relied to establish the standard for issuance of a Rule 17(c) subpoena, which held that pretrial document production is justified when necessary to allow the defendant to adequately prepare for trial. 13 F.R.D. at 338.

There is no question in this case that Kinder will testify at trial. The Government's responses to Defendants' pretrial motions, as well as its affirmations at the pretrial motions hearings, reveal as much. Assuming for the moment that disclosure is otherwise proper, denying Defendant pretrial access to these records would result in considerable delay of the trial after the conclusion of Kinder's direct examination. Kinder's medical and psychiatric records can thus properly be characterized as evidentiary within *Nixon*'s standard despite the fact that their value is limited to impeachment.

    *iii.*    *Specificity*

Rule 17(c) is not intended to provide an additional means of pretrial discovery. *See Caro*, 597 F.3d at 620. A party seeking the pretrial production of documents under Rule 17(c) must do so in good faith, rather than embarking on a "fishing expedition to see what may turn up." *Bowman Dairy Co. v. United States*, 341 U.S. 214, 220 (1951); *see United States v. Richardson*, 607 F.3d 357, 368 (4th Cir. 2010) (citing *Nixon*, 418 U.S. at 700). While the documents must be described with sufficient specificity to allow the court to ascertain their

evidentiary value, it is not required that the subpoenaed materials actually be used in evidence. *In re Martin Marietta Corp.*, 856 F.2d at 622.

The Court finds that Defendant's efforts to obtain Kinder's mental health records stem from a good faith effort to obtain evidence. Again, because Kinder personally testified that she has recently been hospitalized for the treatment of certain psychiatric conditions, Defendant's request cannot fairly be characterized as a "fishing expedition". Defendant identifies by name the four institutions from which he seeks records, and, based on the information provided by Kinder at her plea hearing, the temporal scope of these records is limited to approximately the last ten years. Under these circumstances, his request is sufficiently specific.

### B.    Psychotherapist-Patient Privilege

Federal Rule of Evidence 501 governs evidentiary privileges asserted in federal court. "Testimonial exclusionary rules and privileges contravene the fundamental principle that 'the public . . . has a right to every man's evidence.'" *Trammel v. United States*, 445 U.S. 40, 50 (1980) (quoting *United States v. Bryan*, 339 U.S. 323, 331 (1950)). Because they contravene "the search for truth", testimonial privileges "are not lightly created nor expansively construed[.]" *Nixon*, 418 U.S. at 710; *accord Trammel*, 445 U.S. at 50. Interpretation of an existing privilege must be circumscribed by these guiding principles. *See Zolin*, 491 U.S. at 572 (permitting *in camera* review of documents allegedly subject to the crime-fraud exception to the attorney-client privilege); *Trammel*, 445 U.S. at 51-53 (refusing to recognize a privilege to prevent adverse spousal testimony); *see also Jaffee*, 518 U.S. at 19 (Scalia, J., dissenting). Further, because exclusion of evidentiary material as privileged contravenes the truth-seeking function of the judicial system, the party asserting the privilege has the burden of showing it

12

applies.  *See In re Santa Fe Int'l Corp.*, 272 F.3d 705, 710 (5th Cir. 2001); *In re Grand Jury Proceedings (Gregory P. Violette)*, 183 F.3d 71, 73 (1st Cir. 1999).

The Supreme Court first recognized a federal psychotherapist-patient privilege in *Jaffee*. The case arose in the context of a civil dispute: the administrator of the estate of a man shot and killed by a police officer sought the notes made by a social worker during counseling sessions with the officer after the shooting.  *Id.* at 5.  The Court granted certiorari to resolve a conflict among the circuits as to whether federal courts should recognize a psychotherapist-patient privilege.  The Court first noted that Federal Rule of Evidence 501 authorizes the federal judiciary to recognize new privileges "by interpreting 'common law principles . . . in light of reason and experience."  *Id.* at 8.  In concluding that "reason and experience" dictated in favor of the recognition of the privilege, the Court initially recognized that the same rationale for upholding a spousal or attorney-client privilege undergirds the psychotherapist-patient relationship.  *Id.* at 10.  The Court reasoned that effective psychotherapy requires an atmosphere of confidence and trust wherein the patient is willing to fully disclose sensitive and often embarrassing information.  *Id.*  Apart from the private interest in protecting these confidential communications from disclosure, significant public interests—namely, "[t]he mental health of our citizenry"—supported the privilege's recognition.  *Id.* at 11.

Under *Jaffee*, a party asserting a psychotherapist-patient privilege must show that the allegedly privileged communications were made (1) in confidence, (2) between a licensed psychiatrist, psychologist, or social worker and his or her patient, (3) in the course of diagnosis or treatment.  *Id.* at 15.  The privilege extends only to the communications made between the therapist and patient; the underlying facts of treatment, such as the identity of the mental health

13

care providers, the dates on which the patient was treated, and the length of the treatment are not privileged and are subject to disclosure. *See In re Zuniga*, 714 F.2d 632, 640 (6th Cir. 1983); *Richardson v. Sexual Assault/Spouse Abuse Res. Ctr., Inc.*, 764 F. Supp. 2d 736, 743 (D. Md. 2011) (citing *Zuniga*, 714 F.2d at 640); *Howe v. Town of North Andover*, 784 F. Supp. 2d 24, 34 (D. Mass. 2011) (citation omitted); *Merrill v. Waffle House, Inc.*, 227 F.R.D. 467, 471 (N.D. Texas 2005).  Further, because evidentiary privileges should generally be construed in the most narrow manner that will give effect to their purpose, statements regarding mental health made to an emergency room attendant who is not trained in psychotherapy may not be subject to the psychotherapist-patient privilege. *United States v. Ghane*, 673 F.3d 771, 781-84 (8th Cir. 2012).

Defendant argues that Kinder's diagnoses themselves are not privileged and subject to disclosure because they are not, strictly speaking, confidential communications between Kinder and her mental health providers.  Defendant cites no authority in support of this proposition, and the Court is unable to ascertain any. *See Stark v. Hartt Transp. Sys., Inc.*, No. 2:12-cv-195-NT, 2013 WL 1314398, at *2-4 (D. Me. March 27, 2013) (concluding that *Jaffee*'s privilege shields a patient's diagnoses from disclosure).  Nevertheless, the Court cannot discern any rational basis for distinguishing between a diagnosis and the underlying communication for purposes of disclosure.  A psychiatric diagnosis is born of and inseparably connected to private communications between a therapist and his or her patient.  For this reason, any attempt to draw a line between communications and diagnoses would undermine the basis for recognizing a privilege in the first place.  Like confidential communications, a psychiatric diagnosis reveals sensitive information about a patient that "may cause embarrassment or disgrace" if revealed to others. *Jaffee*, 518 U.S. at 10.  A party armed with knowledge of a patient's diagnosis will be

14

able to make an educated guess about the substance of the communications that gave rise to the diagnosis, which again defeats the purpose for which the privilege is recognized. For these reasons, the Court **FINDS** that Kinder's diagnoses fall within the scope of the psychotherapist privilege.[4]

Significant portions of the records produced in response to the Court's March 5, 2013 order, however, are not subject to this privilege. The four providers listed in the Court's March 5, 2013 order have each submitted the requested records to the Court. Logan Regional Medical Center produced records of several visits Kinder made to its emergency room between 1999 and 2009. The bulk of these visits were made chiefly for medical related complaints and are irrelevant for purposes of this proceeding. The Logan Regional Medical Center records contain limited privileged information relating to a hospital admission on October 31, 1999. Kinder was transferred to South Williamson Psychiatric Care on that date.

Kinder's records from Thomas Memorial Hospital reflect two visits to that hospital's emergency room on April 28, 2010 and June 7, 2012. The April 28, 2010 visit resulted in Kinder's admission to the hospital's inpatient treatment program, where she was discharged on May 2, 2010. Kinder was also voluntarily admitted for inpatient treatment at Highland Hospital between July 4 and 11, 2012. The records are all presumptively privileged, subject to *Ghane*'s limitation for communications provided to emergency room staff. The Thomas Memorial records also contain non-privileged medical records regarding outpatient treatment performed on July 29, 2005.

---

[4] While the psychotherapist privilege may be waived by its holder, *Jaffee*, 518 U.S. at 15 n.14, both parties to this case agree that Kinder has not waived her privilege by responding to the Court's questions at the plea hearing.

The records produced by St. Mary's Medical Center reflect that Kinder reported to its emergency room with mental health related complaints on December 20, 2008 and December 16, 2009.  Kinder's December 20, 2008 visit resulted in an inpatient stay that lasted until Kinder left the treatment center on December 25, 2008.  As for the December 16, 2009 visit, Kinder was admitted overnight and discharged on December 17, 2009.

The Court's review of the produced records reveals that Kinder's psychiatric treatment was usually initiated by a voluntary visit to the emergency room.  Upon arrival to each hospital's emergency room, Kinder was assessed by triage staff and asked to provide a history of physical and mental problems as well as the reason for her current visit.  Kinder would then be transferred to the hospital's behavioral health unit for a psychiatric evaluation.   Under *Ghane*, the psychotherapist-patient privilege does not apply to the information Kinder provided to emergency room staff during these visits.  As she had at the plea hearing, Kinder repeatedly self-reported a previous diagnosis of schizophrenia during these triage assessments.  The references to schizophrenia in the records before the Court, however, are limited to these self-reports.  At no point do the records contain a psychological assessment of Kinder that resulted in a diagnosis of schizophrenia.   Therefore, though they may not be privileged, Kinder's self-reported mental health history in these emergency room records is identical to the history provided publicly to the Court.  Disclosure of this information would be merely cumulative to the information Defendant already possesses.  Where Kinder's statements to emergency room staff mirror the information provided to the Court, this information will not be disclosed.[5]

---

[5] As part of her hospital admissions, Kinder also routinely provided a list of her prescribed medications.  Again, assuming this information is not privileged, it is cumulative and not subject to disclosure.

   C.     *Constitutional Right Juxtaposed with the Psychotherapist-Patient Privilege*

   Having determined that relevant portions of Kinder's records fall within the scope of the psychotherapist-patient privilege, the Court now turns to the question of whether the privilege may be overcome by the assertion of a constitutional right to the confidential materials.

   *Jaffee* was a watershed decision not only because it recognized a federal psychotherapist-patient privilege, but also because it defined that privilege in terms that border on absolute.  518 U.S. at 17.  The Supreme Court took issue with the appellate court's analysis on this latter point. While the Seventh Circuit had recognized a psychotherapist privilege, it held that the privilege's application in each case was dependent on whether "the evidentiary need for the disclosure of the contents of a patient's counseling sessions outweighs that patient's privacy interests."  *Jaffee v. Redmond*, 51 F.3d 1346, 1357 (7th Cir. 1995) (citing *In re Doe*, 964 F.2d 1325, 1328 (2d Cir. 1992)).  In doing so, the Seventh Circuit followed suit with its sister circuits in recognizing a privilege that was highly qualified and required a case-by-case assessment of its applicability. *Id.*; *see also In re Doe*, 964 F.2d at 1328-29; *In re Zuniga*, 714 F.2d at 639-40.  Under this analysis, a patient's privacy interests were little more than "an important factor to be weighed" in determining the admissibility of confidential communications.  *See In re Doe*, 964 F.2d at 1329.

   The Supreme Court ardently rejected this context-specific, ad hoc approach to the applicability of the privilege, stating:

   > We reject the balancing component of the privilege implemented by [the Seventh Circuit] and a small number of States. Making the promise of confidentiality contingent upon a trial judge's later evaluation of the relative importance of the patient's interest in privacy and the evidentiary need for disclosure would eviscerate the effectiveness of the privilege. As we explained in *Upjohn*, if the purpose of the privilege is to be served, the participants in the confidential conversation "must be able to predict with some degree of certainty whether particular discussions will be protected. An uncertain privilege, or one which

17

> purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all."

*Jaffee*, 518 U.S. at 17-18 (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 393 (1981)) (footnote omitted).  The Supreme Court conceded that it could and would not attempt to define the full contours of the infant privilege at the time, leaving that task instead to lower courts.  *Id.* at 18.  It did leave the following parting guidance, however, in a footnote tucked away at the end of its opinion:

> Although it would be premature to speculate about most future developments in the federal psychotherapist privilege, we do not doubt that there are situations in which the privilege must give way, for example, if a serious threat of harm to the patient or to others can be averted only by means of a disclosure by the therapist.

*Id.* at 18 n.19.

Jaffee left the lower courts with the challenge of reconciling this "ill-defined" privilege with the constitutional rights of a criminal accused.  *See id.* at 20 (Scalia, J., dissenting). Subsequent treatment of the privilege in this context has been neither comprehensive nor uniform.  Since *Jaffee* arose in the context of a civil dispute, some district courts have altogether refused to recognize it as precedent in the context of a criminal proceeding. *See Bassine v. Hill*, 450 F. Supp. 2d 1182, 1185 (D. Oregon 2006) (finding, after distinguishing *Jaffee* as a civil case where no constitutional rights were at issue, that a criminal defendant's rights of confrontation and due process outweighed societal interest in the privilege's application); *United States v. Mazzola*, 217 F.R.D. 84, 88 (D. Mass. 2003) (refusing to recognize or apply *Jaffee*'s privilege in a criminal proceeding); *United States v. Alperin*, 128 F. Supp. 2d 1251, 1253-54 (N.D. Cal. 2001) (applying a balancing test to determine whether the privilege applied since "*Jaffee* does not discuss how the privilege is to be applied when a criminal defendant's constitutional rights

are implicated[.]"); *see also United States v. Hansen*, 955 F. Supp. 1225, 1226 (D. Mont. 1997)

(finding *Jaffee* non-controlling in a homicide case where the evidentiary  need for the privileged

information outweighed the deceased victim's privacy interests).  Others—including a judge

within this district—have applied *Jaffee*'s reasoning wholesale, refusing to entertain a criminal

defendant's request for disclosure of privileged material because doing so would require the

balancing of interests discouraged by the Supreme Court.  *See United States v. Shrader*, 716 F.

Supp. 2d 464, 471-72 (S.D. W. Va. 2010); *United States v. Doyle*, 1 F. Supp. 2d 1187, 1189-90

(D. Oregon 1998).

Neither approach provides a satisfactory conclusion.  First, while *Jaffee* is certainly

distinguishable on its facts, the Supreme Court's opinion made no indication that the privilege it

recognized would apply only in civil proceedings.  The existing circuit split that persuaded the

Court to grant certiorari had developed in both civil and criminal cases.  *See Jaffee*, 518 U.S. at 7

(citing cases).  The Court in no way distinguished the appellate cases that had applied the

privilege in a criminal context.  Further, the Supreme Court has rejected the argument that the

attorney-client privilege—an evidentiary privilege closely akin to the psychotherapist-patient

privilege—applies differently in civil and criminal cases.  *Swidler & Berlin v. United States*, 524

U.S. 399, 409 (1998).  The same reasoning applies here.  This Court therefore declines to find

*Jaffee* inapplicable simply because its holding arose from a civil, rather than a criminal, dispute.

Second, the only federal appellate court to address whether the psychotherapist-patient

privilege can, in appropriate circumstances, give way to a criminal defendant's assertion of

constitutional rights has done so under an extremely deferential standard of review.[6]  *Johnson v.*

---

[6] The only other circuit to weigh in on whether a defendant's constitutional rights require

19

*Norris*, 537 F.3d 840, 845-47 (8th Cir. 2008); *Newton v. Kemna*, 354 F.3d 776, 781-82 (8th Cir. 2004).   In both *Johnson* and *Newton*, the Eighth Circuit reviewed petitions filed pursuant to 28 U.S.C. § 2254 that each claimed that the state trial court had erred in denying motions for production of an eyewitness's psychological records.   The question did not receive de novo review.   Instead, the Eighth Circuit merely addressed whether "clearly established Supreme Court precedent requires that a defendant have access to a witness's psychiatric records for impeachment purposes."   *Newton*, 354 F.3d at 781.   *Jaffee*, of course, did not address the issue. Though the Eight Circuit took note of other circumstances where "the Supreme Court has recognized . . . that constitutional rights can trump evidentiary privileges", it could not identify that "clearly established Supreme Court precedent" required the production of records.   *Id.* at 781-82 (citing *Swidler & Berlin*, 524 U.S. at 408 n.3; *Davis v. Alaska*, 415 U.S. 308, 319-20 (1974)).

Finally, though the Government relies heavily on *Shrader* as in-district precedent that should be followed in this case, the factual circumstances from which that decision arose make its reasoning unpersuasive in the case at bar.   In *Shrader*, a defendant charged with stalking by use of an interstate facility sought the production, by way of a Rule 17(c) subpoena, of the

---

production of mental health records subsequent to *Jaffee*—albeit without reliance on that decision—is the Tenth.   *United States v. Robinson*, 583 F.3d 1265 (10th Cir. 2009).   In *Robinson*, the defendant had sought to review the mental health records of a government witness's hospitalization shortly before trial.   The trial court reviewed the records *in camera* and informed the parties that the witness "had been diagnosed with 'poly-substance abuse, mood disorder with an Axis II, temporary, for anti-social traits.'"   *Id.* at 1268.   The court precluded the defendant from reviewing the mental health records and from inquiring into the witness's mental health on cross-examination.   *Id.* at 1268.   The Tenth Circuit found that the trial court's decision violated the defendant's right to due process and confrontation.   *Id.* at 1270-75.   It did so, however, without ever addressing the privileged status of the requested records.   *See id.* at 1279 (Tymkovich, J., dissenting) (arguing that *Jaffee*'s privilege, if applicable, likely barred the disclosure of the documents at issue).

mental health records of his victims.[7]  716 F. Supp. 2d at 465. In order to prove its case, the

prosecution was required to prove that the defendant's course of conduct caused his victims

substantial emotional distress.  *Id.* at 466 (citing 18 U.S.C. § 2261A(2)).  The defendant claimed

that he was entitled to view the records for the purpose of obtaining impeachment material and

claimed that his Sixth Amendment rights overcame the victims' assertion of privilege.  In

rejecting this argument, Judge Berger held that *Jaffee*'s privilege was absolute and that

exceptions to the privilege would "eviscerate [its] effectiveness[.]"  *Id.* at 472-73 (citing *Jaffee*,

518 U.S. at 17).  The defendant also failed to meet Rule 17(c)'s disclosure requirements.  *Id.* at

475-76.  While Judge Berger's opinion is certainly well-reasoned in light of the paucity of

existing case law on the subject, her decision was likely influenced in part by the fact that

permitting the defendant's foray into his victim's mental health records would, in effect, itself be

another act of harassment.

In resolving Defendant's motion for production, the Court has been forced to wrestle with

two competing principles that each support significant and valued societal interests:  the privacy

rights of an individual in the information disclosed for the purpose of receiving psychological

diagnosis and treatment, and the constitutional rights of a criminal defendant to receive a

fundamentally fair trial and to effectively confront the witnesses against him.  The dearth of

substantive treatment of this crucial issue is somewhat inexplicable.  Without clear guidance

from either the Supreme Court or the courts of appeals on whether the psychotherapist privilege

remains absolute even at the expense of a criminal defendant's constitutional rights, this Court

must venture into unknown territory.  In an attempt to follow Federal Rule of Evidence 501's

---

[7]    The defendant had also been convicted of murdering his victim's mother and the man he
believed she was dating some decades earlier.  *Shrader*, 716 F. Supp. 2d at 465.

counsel to interpret evidentiary privileges in light of "reason and experience", this Court has looked to (1) the application of the attorney-client privilege in the face of an assertion of a criminal defendant's constitutional rights, and (2) the analysis of the issue prior to the *Jaffee* decision.

Of all other federal evidentiary privileges, the psychotherapist privilege is perhaps most comparable to the attorney-client privilege. The Supreme Court made this comparison in *Jaffee*, reasoning that both privileges are "rooted in the imperative need for confidence and trust." 518 U.S. at 10 (citing *Trammel*, 445 U.S. at 51)). Also like the attorney-client privilege, the psychotherapist-patient privilege protects only confidential communications—underlying facts do not fall within the scope of the privilege. *See id.* at 15; *Upjohn*, 449 U.S. at 396; *Murdoch v. Castro*, 609 F.3d 983, 995 (9th Cir. 2010). Significant here, then, is the fact that the Supreme Court has similarly declined to establish whether the attorney-client privilege must yield, at least in some circumstances, "to an accused's desire to use confidential information in defense of a criminal case." *Murdoch*, 609 F.3d at 994 (citing *Johnson*, 537 F.3d at 846).

In *Swidler & Berlin*, the Supreme Court addressed whether the attorney-client privilege "prevent[s] disclosure of confidential communications where the client has died and the information is relevant to a criminal proceeding." 524 U.S. at 403. The privileged information was sought in that case not to vindicate the rights of a criminal accused, but to present before the federal grand jury. *Id.* at 401-02. Recognizing that creating an exception to the privilege would chill communications between attorneys and their clients, the Court held that the attorney-client privilege survived the client's death. *Id.* at 408 (citing *Jaffee*, 518 U.S. at 12). As it had in *Jaffee*, however, the Court noted that extraordinary circumstances might warrant exceptions to

the privilege that it neither foresaw nor had occasion to address.  Specifically with regard to the constitutional rights of a criminal defendant to confidential communications, the Court stated that "[p]etitioners, while opposing wholesale abrogation of the privilege in criminal cases, concede that exceptional circumstances implicating a criminal defendant's constitutional rights might warrant breaching the privilege. We do not, however, need to reach this issue, since such exceptional circumstances clearly are not presented here." *Id.* at 409 n.3.

After *Swidler*, whether an accused's constitutional rights may be paramount to the societal interest in protecting disclosure of confidential communications is as open a question in the attorney-client realm as it is within that of the psychotherapist-patient privilege. *See Murdoch*, 609 F.3d at 994-95.  Where the Supreme Court has declined to address the issue in both situations, the more reasoned conclusion is not that a constitutional challenge to the application of the psychotherapist-patient privilege could never succeed, but that the Court has not been presented with the type of "extreme circumstances" that would warrant an exception to the privilege. *See Swidler & Berlin*, 524 U.S. at 409 n.3; *Jaffee*, 518 U.S. at 9 (finding that only a "modest" evidentiary benefit would result from a denial of the psychotherapist privilege).

Because none of the appellate circuits or the Supreme Court has had occasion to address the issue, decisions preceding *Jaffee* are enlightening.  Prior to the *Jaffee* decision, considerable precedent existed in support of the abrogation of the privilege in these circumstances—even among circuits that acknowledged the privilege's general application. *See In re Doe*, 964 F.2d at 1328-29; *United States v. Lindstrom*, 698 F.2d 1154 (11th Cir. 1983); *Indep. Gasoline Marketers*, 624 F.2d at 467-69; *Partin*, 493 F.2d at 762-64.  In *Lindstrom*, the Eleventh Circuit held that the district court erred in refusing to allow the defendants' access to psychiatric records

23

that suggested that the government's chief witness suffered from delusions and emotional

instability marked by suicidal and homicidal ideations.[8]  698 F.2d at 1165-67.  The district court

had denied access to the records after conducting an *in camera* review, reasoning that access to

these confidential materials "would violate the witness' privacy rights."  *Id.* at 1165.  In rejecting

this analysis, the Eleventh Circuit held:

> Broad-brushed assertions of the societal interest in protecting the confidentiality
> of such information cannot justify the denial of these defendants' right to examine
> and use this psychiatric information to attack the credibility of a key government
> witness. A desire to spare a witness embarrassment which disclosure of medical
> records might entail is insufficient justification for withholding such records from
> criminal defendants on trial for their liberty.

*Id.* at 1167.

The Fourth and Fifth Circuits had previously reached similar conclusions where a district

court had refused to allow the defendant to examine psychiatric records that seriously called into

question a government witness's ability to perceive events about which he or she purported to

testify.  *Indep. Gasoline Marketers*, 624 F.2d at 469 ("We can think of no more relevant or

significant material than a hospital record indicating that a witness who is testifying against his

former employer had been under treatment for mental illness which rendered him at that time

delusional and hallucinatory with poor judgment and insight.  Although a trial court should seek

to prevent the disclosure of embarrassing, irrelevant information concerning a witness . . . the

witness' privacy must yield to the paramount right of the defense to cross-examine effectively

the witness in a criminal case.") (citing *Davis v. Alaska*, 415 U.S. 308, 319 (1974)); *Partin*, 493

---

[8] The Eleventh Circuit also held, relying on *Davis v. Alaska*, 415 U.S. 308 (1974), that the
district court improperly curtailed the scope of cross-examination by excluding questions relating
to the witness's prior psychiatric treatment.   The analysis of this issue is not applicable here
because, as discussed below, the Government has represented that it does not intend to prevent
Defendant from eliciting information about Kinder's mental health on cross-examination.

F.2d at 762-63 (finding that withholding relevant portions of a witness's hospital record violated the defendant's right to a fair trial).

The cost of every privilege that excludes "reliable and probative evidence" is "occasional injustice". *Jaffee*, 518 U.S. at 18-19 (Scalia, J., dissenting). While the justice system may accept this cost when the potential evidentiary benefit is merely modest, *see id.* at 11, the price for potentially undermining a criminal defendant's right to effectively cross-examine the government's witnesses is one it cannot afford to pay. Nowhere is the cost of a privilege "more profoundly manifest than in [the] view that 'the twofold aim (of criminal justice) is that guilt shall not escape or innocence suffer.'" *Nixon*, 418 U.S. at 709 (quoting *Berger v. United States*, 295 U.S. 78, 88 (1974)). As important as the psychotherapist-patient privilege may be, it simply does not trump the Constitution.

For these reasons, this Court concludes that *Jaffee*'s rejection of a qualified psychotherapist-patient privilege does not foreclose the possibility that a criminal defendant's constitutional rights may ever surmount it. The psychotherapist-patient privilege contemplates *an exception* where necessary to vindicate a criminal defendant's constitutional rights. The question remains whether Defendant has identified a constitutional need that affords him a right to pretrial production over Kinder's assertion of the privilege.

i.      *Sixth Amendment Right of Confrontation*

The Supreme Court held in *Davis v. Alaska* that a state's policy of protecting the privacy and anonymity of juvenile offenders was secondary to a defendant's Sixth Amendment right of confrontation. 415 U.S. at 318. In that case, the trial court prohibited defense counsel from questioning a crucial government witness about his juvenile criminal record because a state

statute rendered the record confidential. *Id.* at 313-14. The Supreme Court found that restricting the scope of cross-examination in this manner prevented the defendant from demonstrating the witness's possible bias. *Id.* at 318. While the Court acknowledged that the state's policy interests were legitimate, it reasoned that these interests could not "require yielding of so vital a constitutional right as the effective cross-examination for bias of an adverse witness." *Id.* at 320. If the state was concerned with protecting the witness's privacy, the Court reasoned, it should have "refrain[ed] from using him to make out its case". *Id.*

*Davis*'s holding, however, appears to be limited to the restriction of testimony on cross-examination. The Supreme Court has counseled against construing the Confrontation Clause as "a constitutionally compelled rule of pretrial discovery." *Pennsylvania v. Ritchie*, 480 U.S. 39, 52 (1987) (plurality opinion). In *Ritchie*, the Supreme Court reasoned:

> the right to confrontation is a *trial* right, designed to prevent improper restrictions on the types of questions that defense counsel may ask during cross-examination. The ability to question adverse witnesses, however, does not include the power to require the pretrial disclosure of any and all information that might be useful in contradicting unfavorable testimony. Normally the right to confront one's accusers is satisfied if defense counsel receives wide latitude at trial to question witnesses. In short, the Confrontation Clause only guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.

*Id.* at 52-53 (citations, quotation marks, and footnote omitted).

The Government readily concedes in this case that it has no intention of seeking to exclude evidence of Kinder's mental health history developed on cross examination. Apart from the Court's conclusion regarding the admissibility of Kinder's records, Defendant will have free reign, subject to the limitations imposed by Federal Rule of Evidence 403, to question Kinder on cross-examination regarding the history she revealed at her plea hearing. Without any indication

that the Government intends to seek to limit the scope of cross-examination, Defendant's Confrontation Clause argument fails. *See id.* at 53 (citing *Delaware v. Fensterer*, 474 U.S. 15, 19 (1985) (per curiam)) (Confrontation Clause is not implicated where "the trial court [does] not limit the scope or nature of defense counsel's cross-examination in any way." (internal quotation marks omitted)).

ii. *Fifth Amendment Due Process*

The Due Process Clause of the Fifth Amendment guarantees that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V. "The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations."  *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973); *see Brady v. Maryland*, 373 U.S. 83, 87 (1963).  Although *Ritchie* declined to interpret the Confrontation Clause to require pretrial disclosure of privileged material, it held that a defendant's fundamental right to due process required the trial court to conduct an *in camera* inspection of potentially privileged documents to determine if they contain material, exculpatory information.[9]  *Id.* at 57-58.  Central to the Court's analysis was the fact that the state statute governing the privilege provided for disclosure in limited circumstances, such as when directed by court order.  *Id.*  The Court "express[ed] no opinion on whether the result in [that case] would have been different if the statute had protected the [agency's] files from disclosure to anyone, including law-enforcement and judicial personnel."  *Id.* at 58 n. 14.

Although *Ritchie*'s analysis arose from a *Brady* claim because the requested documents

---

[9] "[E]vidence is material . . . if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Id.* at 57 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

were in the possession of a state agency, the case demonstrates that due process entitles a defendant to *in camera* review of potentially privileged documents upon an initial showing of evidentiary need—at least where the privilege contains exceptions which permit disclosure of material evidence. *See Robinson*, 583 F.3d at 1270-74 (finding that the district court's refusal to disclose material evidence contained within psychiatric records of a central government witness produced in response to a Rule 17(c) subpoena violated due process); *see also Zolin*, 491 U.S. at 572 (reasoning that in order to require *in camera* review of attorney-client materials for the purpose of establishing whether a crime-fraud exception applies, the moving party must make "a showing of a factual basis adequate to support a good faith belief by a reasonable person") (citation omitted).

The Supreme Court previously enunciated this principle in *Nixon*, where the President of the United States resisted, by reliance on the executive privilege, a Rule 17(c) subpoena seeking certain tapes and documents relating to meetings between the President and his advisers. 418 U.S. at 686. The Court rejected the President's claim of absolute privilege, finding that its recognition would present an impediment to "the fundamental demands of due process of law in the fair administration of criminal justice." *Id.* at 713. Where a "demonstrated, specific need" for the evidence had been made, due process compelled the production of the confidential documents. *Id.* It follows that where a requesting party establishes that the guarantees of due process may be implicated by the withholding of evidentiary information, confidential documents otherwise subject to the psychotherapist-patient privilege may be disclosed if they are material, either because they may be exculpatory or because they adversely affect the credibility of the government's witnesses. *Love v. Johnson*, 57 F.3d 1305, 1313 (4th Cir. 1995) (citing

28

*Ritchie*, 480 U.S. at 57).

The factual circumstances of this case squarely implicate Defendant's right to a fundamentally fair trial. Kimberly Kinder is *the* central government witness against Defendant and the Government's case may well hinge on her credibility. Kinder is not a victim of Defendant's criminal activity, but an admitted coconspirator who is now cooperating with the Government in hopes of receiving a reduction of her own sentence. As this Court noted at the March 5, 2013 hearing and as admitted by the Government, Kinder's assertion of the privilege may be motivated in part by her desire to be helpful to the Government. Voluntarily supplying impeachment evidence to the Defendant would weaken the Government's case against Defendant and potentially result in an acquittal. Furthermore, Defendant has shown an initial justification for an exception to the privilege. By Kinder's own admission, she has been recently hospitalized on multiple occasions for mental health disorders that potentially implicate her ability to accurately perceive, process, and relate information.

It is difficult to imagine a case that more acutely represents the tension between the psychotherapist-patient privilege and the due process rights of a criminal defendant. While the Court has chosen to recognize this exception, this holding must necessarily be limited to this perfect storm of facts.

  D.  *The Court's Review of Kinder's Records for Materiality*

The Court has reviewed Kinder's records from Thomas Memorial Hospital, Highland Hospital, St. Mary's Medical Center, and Logan Regional Medical Center to determine whether they contain information that bears on Kinder's "ability to perceive or to recall events or to testify accurately." *Butt*, 955 F.2d at 82. As stated above, the Court will not produce documents

29

that contain information merely cumulative to that voluntarily provided by Kinder herself at the plea hearing.

The records do contain, however, potentially exculpatory material that directly calls into question Kinder's ability to accurately perceive the events surrounding the Van Duplex fire. Kinder made two visits to St. Mary's emergency room for mental health related concerns. During the course of these December 20, 2008 and December 17, 2009 hospital admissions, Kinder revealed information to both emergency room and behavioral health unit staff that casts substantial doubt on her mental acuity during the time of the purported conspiracy.[10]  The same reasoning applies to portions of the records from Kinder's visit to the Thomas Memorial Hospital emergency room on April 29, 2010.  After Kinder agreed to cooperate with the Government's investigation in June 2010, she placed two consensually recorded telephone calls to Defendant that the Government intends to introduce at trial.  These calls took place in June, 2010 and August, 2010.  The Thomas Memorial Hospital records provide evidence of Kinder's mental state not only at the time of the alleged arson, but also during the time of her initial cooperation with the Government.  Finally, limited records from Kinder's July 4, 2012 admission and subsequent inpatient stay at Highland Hospital are subject to disclosure.  These records reveal problems related to Kinder's psychiatric status and substance abuse during the time she provided false testimony to the initial grand jury and recanted her statements to later implicate her husband.  The Court therefore **FINDS** the following records to contain material information and

---

[10] Under *Ghane*, 673 F.3d at 782-84, significant portions of these records do not fall within the scope of the privilege because they reflect communications provided to staff in the triage unit of the emergency room.

will produce them under seal,[11] redacted to include only pertinent portions:

From Thomas Memorial Hospital:

- Page one of a document entitled "History and Physical Gudelines [sic]: Behavioral Health Services" and dated April 29, 2010;

- Pages one and two of a four-page document identified by a running header reading "emed Psych History and Physical 4/29/2010";

- Page one of a four-page psychiatric evaluation dated April 29, 2010; and

- Two pages of an integrated behavioral health assessment dated April 29, 2010.

From Highland Hospital:[12]

- A three-page "Care Connection Comprehensive Assessment" dated July 5, 2012;

- A one-page psychiatric rating scale dated July 5, 2012; and

- A nine-page report and evaluation dated July 7, 2012.

From St. Mary's Medical Center:

- Page three of a five-page psychiatric assessment dated December 16, 2009;

- Page one of a psychiatric medical clearance dated December 16, 2009;

- A triage record dated December 16, 2009;

- A triage registration form dated December 16, 2009;

---

[11] The Court will maintain the four complete sets of disclosed documents in its chambers.  With the exception of the limited disclosures the Court makes herein, these documents will not be placed in the record unless a higher court orders otherwise.  The select documents the Court deems subject to disclosure are provided under seal to provide limited access to the parties to this case only, not the public at large.

[12] Throughout all of the records the Court has reviewed, there are references to Kinder's addiction to drugs and drug treatment, including positive drug tests for opiates and benzodiazepines.  However, beyond what is already being provided or otherwise known by the parties, what has not been disclosed is either cumulative or of little to no relevance or materiality.

- Pages one and two of a three-page document entitled "Behavioral Health Intake" dated December 20, 2008;

- Pages one and two of a five-page discharge summary dated December 25, 2008;

- A four-page psychiatric evaluation dated December 21, 2008; and

- Page one of a document identified at the bottom of the page as "Behavioral Health—Preliminary Treatment Plan".

Any further objections to the admissibility of these records for purposes of impeachment will be resolved at trial. The Court further **FINDS** that the Logan General Hospital records contain exclusively irrelevant and immaterial information. These records primarily consist of reports of physical evaluations that have nothing to do with Kinder's psychiatric wellbeing. To the limited extent that they contain information relating to Kinder's mental health, these records are sufficiently dated that they do not have any bearing on the accuracy of Kinder's perceptions or ability to testify truthfully.

*III.   CONCLUSION*

For the foregoing reasons, the Court **GRANTS** the Motion for Early Production of Records [ECF 14], **SUSTAINS IN PART** and **OVERRULES IN PART** the Objection to Motion to Admit Recording and Transcripts of Consensually Recorded Call [ECF 15], **GRANTS** the Motion to Deny any Reference to Other Fire or Fires [ECF 16], and **DENIES AS MOOT** the Motion to Dismiss [ECF 17].

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to the Defendant and counsel, the United States Attorney, the United States Probation Office, and the United States Marshal.

ENTER:        April 5, 2013

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE